**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRIC OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AARON CLARK, et al.,** | : | |
| | : | |
| *Plaintiffs,* | : | |
| **v.** | : | **Case No. 2:08CV982** |
| | : | |
| **THE WALT DISNEY COMPANY, et al.,** | : | **Judge Holschuh** |
| | : | |
| *Defendants.* | : | **Magistrate Judge Abel** |

**PLAINTIFFS AARON CLARK AND JOHN PEIRANO'S**
**MEMORANDUM IN OPPOSITION TO DEFENDANTS JAKKS PACIFIC, INC., PLAY**
**ALONG TOYS AND TOYS "R" US' MOTION FOR SUMMARY JUDGMENT**

Now comes Plaintiffs Aaron Clark ("Plaintiff Clark") and John Peirano ("Plaintiff Peirano") (collectively "Clark") by and though undersigned counsel and respectfully submits this Memorandum in Opposition to Defendants JAKKS Pacific, Inc.'s ("JAKKS"), Play Along Toys ("PAT") and Toys "R" Us' (collectively "JAKKS") Motion for Summary Judgment.[1] The reasons in support of Plaintiff's Memorandum in Opposition are fully set forth in the accompanying Memorandum in Support.

Respectfully submitted,
**THE DICKERSON LAW GROUP, P.A.**
/s/ Brian E. Dickerson
Brian E. Dickerson      (0069227)
Sharlene I. Chance      (0070999)
Kevin R. Conners        (0042012)
5003 Horizons Drive, Suite 101
Columbus, OH 43220
Telephone: (614) 339-5370
Facsimile: (614) 442-5942
bdickerson@dickerson-law.com
schance@dickerson-law.com
kconners@dickerson-law.com
*Attorneys for Plaintiffs*

---

[1] On June 16, 2009, this Honorable Court converted Defendants' Motion to Dismiss (Doc. 11), with respect to Plaintiff's patent infringement claim only, into a Motion for Summary Judgment. (Doc. 48).

# TABLE OF CONTENTS

I.     INTRODUCTION                                                                      1
II.    RELEVANT FACTS                                                                    1
       A.     Plaintiffs' Invention                                                      1
       B.     Plaintiffs' Licensees                                                      2
III.   ARGUMENT                                                                          3
       A.     Claim Interpretation                                                       3
              1.   Ordinary Meaning and Sources of Evidence                              3
              2.   The Person Having Ordinary Skill in the Art                           4
              3.   Claims 1 and 5                                                        6
              4.   The Specification                                                     13
              5.   The Prosecution History                                              17
              6.   Clark's Interpretation of the "Wherein" Limitation Satisfies         20
                   the Definiteness Requirement of 35 U.S.C. §112, ¶2
       B.     The Law of Infringement                                                    24
              1.   Summary Judgment Standard of Review                                   24
              2.   JAKKS Literally Infringes Claims 1 and 5 of the '272 Patent           25
                   a.   JAKKS Violates a "Cardinal Principle" of Patent Infringement     25
                        Doctrine
                   b.   JAKKS Accused Products Possess Each and Every Limitation         26
                        of Claims 1 and 5 of the '272 Patent
                        i.    The "If We Were a Movie" Accused Poster                     27
                        ii.   The "Make Some Noise" Accused Poster                        29
                        iii.  The "Bigger Than Us | Part Time Pop Star"                   30
                              Accused Poster
              3.   JAKKS' Accused Product Infringes Claims 1 and 5 of the                 32
                   '272 Patent Under the Doctrine of Equivalents
IV.    CONCLUSION                                                                        34
CERTIFICATE OF SERVICE                                                                   35

# TABLE OF AUTHORITIES

**Cases**

*ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572 (Fed. Cir. 1984)              25
*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003)                         8, 16
*Abbott Laboratories v. Sandoz, Inc.*,566 F.3d 1282 (Fed. Cir. 2009)                    32
*Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361 (Fed. Cir. 2003)         14, 15
*Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819 (Fed. Cir. 1988)             21, 22
*AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374 (Fed. Cir. 2005)      20
*Amgen Inc. v. Chugai Pharmaceutical Co., Ltd.*.. 927 F.2d 1200 (Fed. Cir. 1991)       24
*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003)          25
*Bancorp Services, L.L.C. v. Hartford Life Insurance Co.*, 359 F.3d 1367 (Fed. Cir. 2004) 23
*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)        24
*Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998)          14
*Daiichi Sankyo Co. v. Apotex, Inc.*, 2009 WL 1437815 (May 19, 2009, D.N.J)            5
*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005)             21, 22, 24
*Dominant Semiconductors SDN. BHD. v. Osram GMBH*, 524 F.3d 1254 (Fed. Cir. 2008)      24

*Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693 (Fed. Cir. 1983)　5

*Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371 (Fed. Cir. 2001)　21

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 493 F.3d 1368 (Fed. Cir. 2007)　3

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.* 344 F.3d 1359 (Fed. Cir. 2003)　33

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 122 S.Ct. 1831,
　152 L.Ed.2d 944 (2002)　33

*Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir. 2008)　25

*Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675 (6th Cir. 2006)　1

*Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008)　23

*Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369 (Fed. Cir. 1999)　8

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111　14
　(Fed. Cir. 2004)

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324 (Fed. Cir. 2005)　14

*Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002)　1, 5

*Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed. Cir. 1984)　5

*Kyocera Wireless Corp. v. International Trade Commission*, 545 F.3d 1340 (Fed. Cir. 2008)　8

*Leggett & Platt, Inc. v. Hickory Springs Mfg., Co.*, 285 F.3d 1353 (Fed. Cir. 2002)　25

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)　15

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384,　13
　134 L.Ed.2d 577 (1996)

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005)　9

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473 (Fed. Cir. 1998)　*passim*

*Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394 (Fed. Cir. 2008)　20

*Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004)　4

*Oakley, Inc. v. Sunglass Hut Intern.*, 316 F.3d 1331 (Fed. Cir. 2003)　21

*Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376　5
　(Fed. Cir. 1983)

*PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359 (Fed. Cir. 2005)　25

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)　*passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999)　6

*Power Mosfet Technologies, L.L.C. v. Siemens AG*, 378 F.3d 1396 (Fed. Cir. 2004)　9

*Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841 (Fed. Cir. 2006)　17

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358 (Fed. Cir. 2009)　25

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337　16
　(Fed. Cir. 2001)

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005)　21

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985)　4

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357 (Fed. Cir. 2008)　21

*Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313 (Fed. Cir. 2002)　15

*U.S. Phillips Corp. v. Iwasaki Electric Co., Ltd.*, 505 F3d 1371 (Fed. Cir. 2007)　25

*Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.*, 212 F.3d 1377 (Fed. Cir. 2000) 25, 32

*Verve, LLC. v. Crane Cams, Inc.*, 311 F.3d 1116 (Fed. Cir. 2002)　21

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040,　25
　137 L.Ed.2d 146 (1997)

*Young v. Lumenis, Inc.*, 492 F.3d 1336 (Fed. Cir. 2007)　24

*Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418 (Fed. Cir. 1994)　26

**Statutes and Rules**
35 U.S.C. § 103                                                                            18
35 U.S.C. § 112                                                                      *passim*
35 U.S.C. § 282                                                                            23
Fed. R. Civ. P. 56(c)                                                                      24
**Additional Authority**
*American Heritage Dictionary of the English Language* (4th ed. 2000)          10
*The Oxford American Dictionary of Current English* (Oxford University Press, 1999)     11
*Random House Webster's Unabridged Dictionary* (Random House, 2005)              11
*Graphics, Design & Printing Terms: an International Dictionary*                 28
        (Design Press Division of Tab Books, NY; 1980, 1989)

## SUMMARY

In its Motion for Summary Judgment, JAKKS' argues that its products cannot infringe against Clark's '272 patent because the concept of Clark's patent requires the housing unit for the speech device to be identical or camouflaged by covering the housing unit with art from the underlying poster art. Doc. 11, p. 11. JAKKS' assertion of the word "camouflaged" in the prosecution history has nothing to do with matching art or even whether the color scheme must be identical to the surrounding poster art. JAKKS' piecemeal argument fails to consider key aspects of the intrinsic record, including claim terms of claims 1 and 5 of the '272 patent, the prosecution history, dictionary definitions and other comparable sources. Specifically, within its Motion, JAKKS fails to address how the claim limitation "artistically blends in with the surrounding art that is not covered by said housing" (*'272 Patent 3:11-13*, '272 Patent, attached hereto as Appendix A to Exhibit A) affects the claim scope as understood by a person of ordinary skill in the art. JAKKS argues that the "housing surface must be prepared so that it matches the art that is covered by the housing." Doc. 11, at 7. JAKKS' position is flawed as JAKKS (1) fails to interpret the claim language through the lens of a person of ordinary skill in the art [*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)]; (2) improperly imports limitations from the specification into the claims; and (3) provides this court with a claim

interpretation that ignores the context of the claimed invention. *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369 (Fed. Cir. 1999); *Phillips*, 415 F.3d at 1314.

With respect to patent infringement, summary judgment "is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused devise either literally or under the doctrine of equivalents." *U.S. Phillips Corp. v. Iwasaki Electric Co., Ltd.*, 505 F.3d 1371, 1374-75 (Fed. Cir. 2007). The "cardinal principle" of patent infringement is that the "accused device must be compared to the claims rather than to a preferred or commercial embodiment." *Amgen, Inc. v. Hoeschst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003). Furthermore, courts have additionally held that "[i]nfringement under the doctrine of equivalents requires an intensely factual inquiry." *Vehicular Technologies Corp. v. Titan Wheen Intern., Inc.*, 212 F.3d 1377, 1381 (Fed. Cir. 2000).

Defendants' understanding of the '272 Patent is wholly misplaced. Nowhere in the '272 Patent are the words "camouflaged" or "identical" used. The key language of claims 1 and 5 requires the housing artwork to be designed "such that said housing ***artistically blends in*** with the surrounding poster art that is not covered by said housing." Exhibit A, Appendix A, *'272 Patent 3:11-13*. The housing unit does not have to be identical to the underlying poster. As discussed in greater detail in Clark's Memorandum in Opposition to JAKKS' Motion for Summary Judgment, claims 1 and 5 of the '272 Patent are void of any use of the words "camouflaged" or "identical." JAKKS, without citing to any such language in the '272 Patent, erroneously conclude that "the housing surface must be prepared [with] art that is exactly like the art over which the housing is placed so that the housing and poster become 'indistinguishable from one another.'" Doc. 11, p. 13.

A person of ordinary skill in the art would understand the "wherein" limitation in claims 1 and 5 to mean that the color, finish, and surface artwork of the housing unit on the posters would form a harmonious visual effect with the surrounding art on the poster. To artistically blend the housing unit to the poster art, a graphic designer – a person of ordinary skill in the art – would generally choose a color for the housing unit that is in the color scheme or predominant hue of the surrounding poster art. A proper comparison of the claim language of the '272 patent and the accused posters provided for herein and attached to this Memorandum in Support demonstrates that JAKKS' infringing products have each and every claim limitation of the claims 1 and 5. A reasonable jury could find that the accused products literally infringe on claims 1 and 5 of the '272 patent.

Here, summary judgment is proper only if this Honorable Court discerns no genuine issue of material fact and that no reasonable jury could find equivalence. A jury should be given the opportunity to decide this "intensely factual" inquiry of whether there exist insubstantial differences between the artwork on the housing of JAKKS accused products and what is claimed in the '272 patent. Literal infringement is a question of fact. Courts are well aware of the difficulty in granting summary judgment motions on issues which require a delicate balance of many factual components. Even if, for argument sake, literal infringement is lacking, insubstantial differences are present between the artwork on the housing of JAKKS accused products and what is claimed in the '272. JAKKS' accused posters will infringe under the doctrine of equivalents if the products "perform substantially the same function, in substantially the same way, to achieve substantially the same result, as disclosed in the claim." *Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1296 (Fed. Cir. 2009); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n.8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

<u>**MEMORANDUM IN OPPOSITION**</u>

## I.  <u>INTRODUCTION</u>

Clark brought this patent infringement action to stop JAAKS from engaging in activity that infringes Plaintiffs' '272 patent.  The '272 patent "relates generally to the art of posters and more particularly to a talking poster that projects a recorded sound using a device that is attached to the poster with material that is painted to match the color scheme of the poster art."  Exhibit A, Appendix A, *'272 patent 1:7-11.*  JAKKS, being aware of the '272 patent, has infringed on Clark's patent by manufacturing, reproducing and/or selling infringing talking posters that possess each and every claim limitation of claims 1 and 5 of the '272 patent.  Doc. 51.

JAKKS argues that its products cannot infringe against Clark's '272 patent because the concept of the '272 patent requires the housing unit for the speech device to be identical or camouflaged by covering the housing unit with art from the underlying poster art.  (cite) JAKKS contends that since the housing units of its infringing posters are "simply placed over the artwork and do not contain any type of matching art" that the posters cannot infringe on Plaintiffs '272 patent as a matter of law.  Doc. 11, p. 7.  As discussed in greater detail herein, this argument is legally and factually flawed.

## II.  <u>RELEVANT FACTS</u>

### A.  **Plaintiffs' Invention**

On August 20, 1996, the U.S. Patent and Trademark Office issued to Plaintiff Clark U.S. Patent No. 5,548,272 which is entitled "Talking Poster" (hereinafter "Talking Poster" or "the 272 Patent").[2]  Clark was the first person to invent the Talking Poster that included artwork on the

---

[2] The patent law grants Plaintiff the right to exclude others from making, using, or selling his invention. The right to exclude others also includes infringing produces or devices that are equivalent to Plaintiff's claimed invention.  The doctrine of equivalents extends the right to exclude beyond the literal scope of the claims.  *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1053 (Fed. Cir. 2002); *Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461

housing unit that artistically blended with the surrounding poster art. In May 1999, Plaintiff Clark assigned fifty percent (50%) equal share ownership of the '272 patent to Plaintiff Peirano. (Doc. 51, ¶¶ 28, 38, Exhibit M). Plaintiffs Clark and Peirano are the rightful owners of all rights, title and interest in the '272 patent. (Doc. 51, ¶ 38). Clark's '272 patent incorporates sound into posters featuring prominent entertainers, cartoon characters and blockbuster movie characters, such as Warner Brother's Batman Forever, Looney Toons and Space Jam (Michael Jordan); Comedy Central's South Park; New Line Cinema's Austin Powers 1 and 2; Saban Entertainment's Power Rangers; Toho Co., Inc.'s Godzilla; The Ohio State University's Official Collegiate Product; Dic Entertainment's Sailor Moon and Bump in the Night; and Winterland Entertainment's NSYNC, Backstreet Boys and Ricky Martin. (Doc. 51 ¶ 25).

B.     Plaintiffs' Licensees

Plaintiffs patented technology appears relatively simple, yet reflects a critically novel and counterintuitive insight by the named inventors. "The present invention offers novel features to enable talking posters." Exhibit A, Appendix A, *'272 patent 1:16-17*. It should come as no surprise, therefore, that several companies have sought and agreed to license the '272 patent, including Warner Brothers, Comedy Central, Saban Entertainment, New Line Cinema, Winterland, OSP and Resaurus Company. (Doc. 51, ¶ 25, 27, 34).[3] For example, (1) on December 7, 1998, The Ohio State University Office of Trademark and Licensing Services awarded Clark a license for the use of The Ohio State University trademarks; (2) on April 20, 1998, the Resaurus Company was "granted the license to use 'Talking Posters' in connection with the manufacture, sale and distribution of certain articles and products developed, created or

---

F.3d 675, 688 (6th Cir. 2006) (the scope of a patent is not limited to its literal terms but also embraces all equivalents to the claims described).

[3] Plaintiffs' have also sold the Talking Poster in Wal-Mart, Target, Spencer Gifts, Hot Topic, Kay Bee Toys and Blockbuster Video. (Doc. 51, ¶ 26-27).

generated by RESAURUS in the course of RESAURUS' business…"; and (2) on May 6, 1999, New Line Cinema agreed to display Clark's Austin Powers Talking Poster in the New Line Cinema booth at the June 1999 licensing show. *Licensing Agreements*, attached hereto collectively as Exhibit B. Licenses were asked for and granted as the parties were fully aware of the '272 patent's validity and that infringement would be likely without one; something JAKKS explicitly failed to do.

## III.  ARGUMENT

### A.  Claim Interpretation

JAKKS' proposed construction is nothing more than an acontextual attempt to accommodate its non-infringement assertions into the claims in violation of fundamental principles of claim interpretation. JAKKS adduces arguments that impermissibly import claim limitations from the specification into claims 1 and 5 of the '272 patent; cherry picks select words in the intrinsic record to support its position while ignoring important language — particularly claim terms — that undercut its argument; and at no point in its brief addresses the level of ordinary skill in the art, which is a fundamental component to claim interpretation. Specifically, JAKKS does not address how the claim limitation "artistically blends in with the surrounding art that is not covered by said housing" affects claim scope as understood by a person of ordinary skill in the art. As will be discussed below, it is this limitation as well as other aspects of the intrinsic record that provide crucial context to the claim scope, and lead to the conclusion that JAKKS infringes claims 1 and 5 of the '272 patent.

#### 1.  Ordinary Meaning and Sources of Evidence

Patent law has long held that "patents are addressed to and intended to be read by others of skill in the pertinent art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en

banc).  A bedrock principle of claim construction, therefore, is that the "terms used in a claim bear a 'heavy presumption' that they have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1334 (Fed. Cir. 2004).   *See also*, *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) (stating "[t]he inventor's words that are used to describe the invention … must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology").

There are two types of interpretive sources: intrinsic and extrinsic.  The former comprises the claims, specification, and prosecution history; the latter includes such things as expert testimony, dictionaries, and treatises, all of which are external to the patent document. Among the extrinsic sources, the Federal Circuit has stated "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation."  *Phillips*, 415 F.3d at 1318. Dictionaries and comparable sources, therefore, are available interpretive sources as long as they are used in a manner that is consistent with the patent's context. As the *Phillips* court noted, "the sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.*

## 2.    The Person Having Ordinary Skill in the Art

As noted above, claims are interpreted as understood by a person of ordinary skill in the art.  The person of ordinary skill in the art is not the inventor or a particular handyman; rather, the artisan is a hypothetical person unrelated to the subjective motivations of the inventor.  *See*, *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). The Federal

Circuit has identified several factors that a court should consider in constructing this hypothetical person. *See*, *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed. Cir. 1984) (referring to the person of ordinary skill in the art as a "hypothetical" person). These factors include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 696 (Fed. Cir. 1983), *citing, Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.* 707 F.2d 1376, 1381-82 (Fed. Cir. 1983).

All of these factors may not be present "in every case, and one or more of these or other factors may predominate in a particular case." *Envtl. Designs*, 713 F.2d at 696-97. *See also*, *Daiichi Sankyo Co. v. Apotex, Inc.*, 2009 WL 1437815 (May 19, 2009, D.N.J). The principal factors in the present case are the types of problems encountered in the art and prior art solutions to those problems. At the time Clark invented his talking poster, there was no such thing as a talking poster industry or even a talking poster. The Hoshi reference, cited by the Examiner, discloses and claims a cumbersome functional device upon which posters or photographs could be placed; it is not a talking poster. The '272 patent, in contrast, discloses a poster upon which a housing unit (which concealed the functional components) could be placed. Moreover, contrary to Hoshi and existing technology at the time, Clark's claimed invention contemplated the use of artwork on the housing that blended in with the artwork on the surrounding poster. Thus, prior to Clark's invention, there did not exist a talking poster that included a housing with artwork that artistically blended in with the surrounding poster art.

With this background in mind and with the understanding of the importance of the "artistically blends in" limitation to the present case, the person of ordinary skill in the art would typically be a graphic designer with a year or more experience working in the visual communications field. Here, Ellen Shapiro is a person of ordinary skill in the art. *See*, Exhibit A, Shapiro Declaration. Ms. Shapiro is a graphic designer who holds a B.A. in art with a specialization in design. Shapiro Declaration, ¶ 1. Ms. Shapiro owns a graphic communications business, serves as an adjunct professor and lecturer in corporate design, typography, and design presentation at leading design schools and colleges and has wrote articles on design for the entertainment industry, which included an article on rock posters. *Id.*

       **3.**    **Claims 1 and 5**

Claim interpretation begins with the claim language. *See*, *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves."). Claims 1 and 5 of the '272 patent have six and five broad limitations, respectively. The only limitation at issue in the present case is the "wherein" clause, which reads:

> Wherein a surface of said housing is prepared with a matching art which is substantially the same as that area which appears on said portion of said poster that said housing covers when said housing is attached to said poster, such that said housing artistically blends in with the surrounding poster art that is not covered by said housing.[4] Exhibit A, Appendix A, *'272 Patent 3:6-12*.

In its opening brief and interrogatory responses, Defendant JAKKS implicitly concedes that it practices every limitation of claims 1 and 5 with the exception of the aforementioned "wherein" limitation. Doc. 11, at 4, 7 and Exhibit C JAKKS' response to Clark Interrogatory No. 2. For

---

[4] This language is from claim 1 of the '272 patent. Claim 5 has identical language with the exception of the opening words: "Wherein a surface of said house is prepared with a matching art which is…." The focus of the claim construction dispute centers on the remaining language of the claim, which is identical in both claims 1 and 5.

instance, JAKKS — in its brief and in response to Clark's Interrogatory No. 2 — only focuses on the "wherein" clause or what JAKKS refers to as the "housing limitation" to support its non-infringement position.  Doc 11, at 3 ("The key limitation are [sic] in the last element [i.e., the "wherein" limitation] are identical in independent Claims 1 and 5."); Doc. 11, at 7  (focusing solely on "wherein" limitation of claims 1 and 5); JAKKS' Response to Clark's First Set of Interrogatories, No. 2, attached here to as Exhibit "C"  (stating the only reason JAKKS does not infringe claims 1 and 5 is because the accused products do not have housing unit artwork that "is substantially the same as that area which appears on said portion of said poster that said housing covers when said housing is attached to said poster, such that said housing artistically blends in with the surrounding poster art that is not covered by said housing).  Thus, the language in the "wherein" clause is the only claim language in dispute.

JAKKS asserts that this language requires that the "housing surface must be prepared so that it matches the art that is covered by the housing."  Doc. 11, at 7. *See also*, Exhibit C JAKKS' response to Clark Interrogatory Nos. 2, 6, and 17.  Accordingly, this "claim language compels this result when it requires the housing surface to be prepared with 'matching art' that is 'substantially the same' as the area of the poster that the 'housing covers.'" Doc. 11, at 7.

There are several errors in JAKKS position.  First, contrary to basic claim interpretation principles, JAKKS makes no attempt to interpret the claim language through the lens of a person of ordinary skill in the art. *See*, *Phillips*, 415 F.3d at 1313 ("We have made clear … that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."); *Multiform Desiccants*, 133 F.3d at 1477 ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.").

Moreover, rather than viewing the entire limitation in context, JAKKS pays lip service to important claim terms such as "artistically blends in," while acontextually selecting a few words such as "matching art" and "substantially the same" to support its position. But as the Federal Circuit has stated, "[p]roper claim construction … demands interpretation of the entire claim in context, not a single element in isolation." *Hockerson-Halberstadt, Inc.* 183 F.3d at 1374. *See also*, *Kyocera Wireless Corp. v. International Trade Commission*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) (stating "this court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole"); *Phillips*, 415 F.3d at 1314 (stressing "the context in which a term is used in the asserted claim can be highly instructive"); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

The language in claims 1 and 5 that JAKKS ignores — that which places the entire limitation in context — is the phrase "**such that** said housing **artistically blends in** with the surrounding poster art that is not covered by said housing." (Emphasis added). Patent law demands and a person of ordinary skill in the art would understand that the terms "matching art" and "substantially the same" must be read in the context of the term "artistically blends in." When interpreted in the context of the claims as a whole, a person of ordinary skill in graphic design would understand the "wherein" limitation to mean that **the color, finish, and surface artwork of the housing form a harmonious visual effect with the art on the poster.** While this definition includes housing art that is identical to the poster art background, it is certainly not limited to such, as JAKKS argues.

The phrase "artistically blend in" cannot mean the same thing as "matching" or "substantially the same," as this would render "artistically blend in" superfluous. All claim limitations must be given meaning. *See*, *Power Mosfet Techonologies, L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (stating that interpretations of claims rendering claim terms superfluous is generally disfavored); *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

To artistically blend the speaker housing artwork to the poster art, a designer would choose a color for the housing that is significant in the color scheme of the poster. Thus, a person of ordinary skill in the art would understand that the colors of the housing and the color scheme of the poster would "artistically blend in " — and therefore be harmonious — if the two color schemes were the same, analogous (two or three different hues adjacent on the industry-standard color wheel;[5] complementary (two hues opposite on the color wheel), or split Complementary (two adjacent hues plus one opposite). JAKKS' accused poster, "Make Some Noise" in Illustration 1 below, demonstrates this approach. *See also*, Exhibit A, Shapiro Declaration, ¶ 13 and Appendix E.

---

[5] As an industry standard, the color wheel is a "comparable source" under *Phillips*. *See*, Shapiro Declaration, ¶¶ 6-7.





**COLOR WHEEL**
with analogous color scheme − light tints of
three of the 12 sections of the wheel, lavender
through turquoise − highlighted.

The lavender of the speaker housing was
selected to artistically blend in with the overall
visual effect of the color scheme of the poster.

**Illustration 1 — In the "Make Some Noise" Hannah Montana poster shown above, JAKKS chose a light lavender color for the plastic speaker housing, which forms a harmonious visual effect with the Analogous color scheme of the poster art. Obviously, JAKKS' choice of the light lavender was driven by aesthetic considerations.**[6]

Clark's proposed claim interpretation is supported by general purpose dictionaries. *See*, *Phillips*, 415 F.3d at 1318 ("Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction"). When the word "blend" is referred to as a visual, as in art, patterns, colors, looks, and styles, it is considered an intransitive verb. Accordingly, the *American Heritage Dictionary of the English Language* (4th ed. 2000) defines "blend" as: "1a: to mingle intimately or unobtrusively; b. to combine into an integrated whole; **2.** To produce a harmonious effect or result. Example: picked a tie that blended with the

---

[6] As further example, a man does not pick a tie that is the exact identical color as his shirt or suit. For aesthetic reasons, a man would choose a tie that forms a harmonious effect and "artistically blends in" with the overall color scheme of his shirt and suit.

jacket" And the *Random House Webster's Unabridged Dictionary* (Random House, 2005) defines "blend" as "to fit or relate harmoniously." From *The Oxford American Dictionary of Current English* (Oxford University Press, 1999), the word "Artistic" is defined as: "1) having natural skill in art 2) made or done with art 3) of art or artists." And in the same dictionary, the definition of the intransitive verb, "blend" as it refers to décor, music, colors is to "go well together; harmonize." *See*, Exhibit A, Shapiro Declaration, ¶ 14 and Appendix I.

These dictionary definitions are — as the *Phillips* court requires — entirely consistent with the context and intrinsic record of the '272 patent. *Phillips*, 415 F.3d 1320-24 (emphasizing that dictionaries are permissible tools of interpretation only to the extent the definitions are consistent with context and intrinsic record of the patent). *See*, Section III.A.5, *infra*, for how the prosecution history provides context that supports Clark's claim interpretation.

In contrast, JAKKS' position conflicts with *Phillips* and its requirement of contextual consistency. In arguing that the "wherein" clause of claims 1 and 5 is limited to artwork that is identical to the poster artwork, JAKKS relies on a dictionary definition of two claim terms — "match" and "blend" — that are inconsistent with the context of the '272 patent. For instance, JAKKS' cited definition of "blend" — to "combine or mix as to render the constituent parts indistinguishable from one other" (Doc. 11, at 8) — relates to cooking, paint mixing and such, in which two ingredients or colors are combined to become one. JAKKS' position ignores the definition of "blend" — to harmonize — that is more relevant to design art, and one that a person of ordinary skill in the art would understand is the central context of the '272 patent.

Similarly, JAKKS relies on an acontextual definition of the word "match" as "a person or thing that is exactly like another" and "having the exact coloring or artwork." (Doc. 11, at 8). According to JAKKS, "[t]here simply is no other plausible meaning for these words." (Doc. 11,

at 8). That assertion is not true. The claim language requires the relationship between the housing artwork and poster artwork to be "**such that** said housing **artistically blends in** with the surrounding poster art that is not covered by said housing." (**Emphasis added**). As noted above, JAKKS completely ignores this claim language. Thus, JAKKS' position limiting claim 1 and 5 to housing artwork that is identical or exact to the poster artwork becomes untenable once this claim language is understood in proper context and when the claim is interpreted as a whole.

The claim term "artistically blends in," therefore, is broader and includes a spectrum that would be understood by a person of ordinary skill in graphic design. On one end of the spectrum is JAKKS' proposed definition to create an exact copy or duplicate, and on the other end of the spectrum artistic skill is used to create color, finish, and surface artwork of the housing that forms a harmonious visual effect with the art on the poster.

At the same time, it is important to emphasize that a person of ordinary skill in the art would understand that the scope of the claim term "artistically blend in" would not, for example, include housing made of material that has a completely different texture or finish than that of the poster art, or that is made of a material in a color or colors that is not present in the poster art or that do not harmonize with it. Thus, for example, as indicated in the illustrations below, the accused posters would not infringe *if* they possessed a color scheme of primary shades of purple, lavender, and turquoise or if they had a housing of acid green or orange stripes, or chrome with a look and feel of automobile or motorcycle parts.

 

**Illustration 2 — The hypothetical "Make Some Noise" Hannah Montana poster shown above left has a speaker housing that has orange and green stripes. Neither of these colors is present in the poster art; therefore a person of ordinary skill in the art would understand this poster would not infringe because the housing artwork does not "artistically blend in" with the remaining poster artwork. Similarly, the hypothetical "Part Time Pop Star" poster shown above right has a speaker housing that is fuzzy orange and black leopard skin. Neither the pattern nor the color is present in the poster art; therefore, a person of ordinary skill in the art would understand this poster would also not infringe because the housing artwork does not "artistically blend in" with the remaining poster artwork.**

In contrast, the housing artwork on the accused posters artistically blend in with the poster art and, therefore, infringe the '272 patent. *See* Section IV, *infra*, discussing infringement.

### 4.    The Specification

The specification has long been emphasized as frequently being the "primary basis" or "best source" for understanding claim terms. *Multiform Desiccants*, 133 F.3d at 1478.   The patent claims "must be read in view of the specification, of which they are a part." *Markman v.*

*Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This standard rule, however, is subject to a very important caveat, namely it is improper to import (*i.e.*, ''read in'') a limitation from the specification's general discussion, embodiments, and examples. As the court in *Phillips* admonished, "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323. And in *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005), the Federal Circuit noted:

> We do not import limitations into claims from examples or embodiments…, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that 'the patentee … intends for the claims and the embodiments in the specification to be strictly coextensive.'

Thus, "[e]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). The reason for not limiting patentees to specifically disclosed embodiments is that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323.

The Federal Circuit has recognized that "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). But the court has provided guidance in balancing these competing considerations. For instance, the court in *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361, 1370 (Fed. Cir. 2003), stated this:

> balance turns on how the specification characterizes the claimed invention. In this respect, this court looks to whether the specification refers to a limitation only as

a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment. *For example, it is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention.* On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.

(*Emphasis added*). In *Alloc* the court held that the "specification read as a whole leads to the inescapable conclusion that the claimed invention must include [the] 'play' [limitation] in every embodiment [because] the patent specification indicates that the invention is indeed exclusively directed toward flooring products including 'play'" and the "specification also distinguished the prior art on the basis of 'play.'" *Id.* at 1370-71.

The '272 patent specification does not lead one of ordinary skill in the art to conclude that the claims and embodiment of the '272 patent are "strictly coextensive" or to "the inescapable conclusion" that — as JAKKS asserts — the claims require that the housing surface be identical or exactly represent the art that the housing covers. *See*, Doc. 11, at 7-9. JAKKS interpretation of the specification language and its sole focus on the preferred embodiment would violate the fundamental principle of claim construction against importation of limitations from the specification. While the '272 patent discloses only one embodiment — the preferred embodiment — the Federal Circuit "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). *See also*, *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002) (reversing district court for improperly importation limitation from specification into claims, and stating "[i]nstead of using the specification as context, the district court apparently limited the 'clip (28)' recited in claim 1 to the embodiment described in the specification. We have

cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification").

JAKKS misapplication of the law is highlighted when the present case is contrasted with the facts in *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337 (Fed. Cir. 2001). In *SciMed*, the Federal Circuit rejected the patentee SciMed's argument that the district court improperly imported a limitation from the specification. The reason for rejecting this argument is that the specification contained unequivocal language that would lead a person of ordinary skill in the art to conclude that claim scope was limited to the embodiment set forth in the specification. Specifically, the key specification language for the court read:

> The intermediate sleeve structure defined above is the basic sleeve structure for *all embodiments of the present invention contemplated and disclosed herein*— namely, an inner core tube bonded to a distal portion of the main catheter shaft, with an outer sleeve forming an annular continuation of the inflation lumen through the main shaft between the core tube and outer sleeve.

*Id.* at 1343 (*Emphasis in original*). According to the court, "[t]he words 'all embodiments of the present invention' are broad and unequivocal. It is difficult to imagine how the patents could have been clearer in making the point that the coaxial lumen configuration was a necessary element of every variant of the claimed invention." *Id.* at 1344.

There is no such limiting language in the '272 patent's specification. In fact, with respect to the embodiment set forth in the specification, the text expressly states "[t]he following is *one example* method for constructing a preferred embodiment of the invention." Exhibit A, Appendix A, '*272 Patent 2:18-19*. Accordingly, "[w]here the written description does not expressly limit the claim term and otherwise supports a broader interpretation," the Federal Circuit mandates that the claim language in question be given "its full breadth of ordinary meaning as understood by persons skilled in the art." *ACTV, Inc.*, 346 F.3d at 1091.

As noted above, a person of ordinary skill in the art would understand the "wherein" limitation of claims 1 and 5 to mean the color, finish, and surface artwork of the housing would form a harmonious visual effect with the art on the poster. This interpretation includes the preferred embodiment, but it is broader than the preferred embodiment. As the Federal Circuit has stated, while the court "cannot import limitations from the preferred embodiments into the claim, we also should not normally interpret a claim term to exclude a preferred embodiment." *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006). What artistically blend in does not include is housing and poster artwork that lacks adjacent, complimentary, or split complimentary color; or a completely different texture or type of material. *See* Section III.A.3, *supra*.

### 5. The Prosecution History

There is nothing in the prosecution history of the '272 patent that would limit the "wherein" limitation of claims 1 and 5 in a manner asserted by JAKKS. In fact, the prosecution history supports Clark's claim interpretation. JAKKS makes much of the word "camouflaged" in the prosecution history. (Doc. 11, at 10). But the word "camouflaged" used in this context has nothing to do with *matching* art or whether the color scheme of the housing artwork must be identical to the poster artwork. Rather, Clark was representing that housing artwork — regardless of what it looks like — can be used to render less conspicuous (in other words, "camouflage") the functional components of the housing, namely the electronic circuitry and sound emanating means.[7] This point is supported by the fact that the Hoshi reference cited by the Examiner as prior art is not a talking poster, but a cumbersome functional device that allows

---

[7] Claims 1 and 5 uses "matching" "substantially the same" and "artistically blends in." The specification is the "primary basis" or "best source" for understanding claim terms. *Multiform Desiccants*, 133 F.3d at 1478. See, III.A.4, *supra*.

for photographs or posters to be displayed on the device. Hoshi makes no mention of housing artwork, let alone artwork that would render the housing less conspicuous.

The Examiner rejected claims 1-11 of the '272 patent under 35 U.S.C. § 103, finding that the poster, speaker, and electric circuit limitations of the '272 patent were met by Hoshi, but not the artwork limitation. The Examiner nonetheless rejected the claims because, according to the Examiner, the artwork on the housing "lack[ed] criticality because the housing of Hoshi would still serve the same function as a housing for the electrical components." *See*, Exhibit D, *Examiner's Action*. In his Amendment, Clark distinguished his claimed invention from Hoshi on structural grounds, and by noting that contrary to the Hoshi reference, Clark's invention allowed for artwork to be used on the housing so that the housing "visually blends in" with the poster art work and "effectively hide[s]" the housing. *See*, Exhibit E, *Amendment and Remarks to Patent Application*. In other words, the housing is "camouflaged," and thus rendered less conspicuous.

This camouflaging function can be achieved with any type of art that, as Clark noted, "visually blends in" with the poster art, not just matching art as asserted by JAKKS. The point is that unlike the Hoshi reference, the '272 patent contemplates *some* type of artwork on the housing that will render the functional aspects less conspicuous. Thus, the term "camouflaged" as used in the prosecution history of the '272 patent refers to art work that artistically blends in with the poster art work; and has nothing to do with whether the housing artwork matches the poster artwork. This representation also formed part of the interview Clark had with the Examiner, wherein the Examiner noted that the housing possess art work that "blends in with the artwork" of the poster. *See*, Exhibit F, *Examiner Interview Summary Record*.

JAKKS also cites Clark's statement in the prosecution history that the "housing can be printed with artwork so as to visually blend in with the actual artwork of the poster, and

effectively hide the sound module so as not to disturb or interrupt the visual flow of the poster."

But this Amendment language actually supports Clark's position. As noted above, any style or color scheme of artwork — not just matching artwork — can be employed to "effectively hide" the housing or render it less conspicuous. The type of artwork contemplated by the '272 patent — as stated in claims 1 and 5 — "artistically blends in with the surrounding poster art." Consistent with the claim language, the prosecution history states that the "housing can be printed with artwork so as to **visually blend in** with the actual artwork of the poster." *See*, Exhibit E. (**Emphasis added**). Again, the examiner's interview summary uses the phrase "blends in" when referring to the relationship between housing artwork and the surrounding poster art.

As discussed above in the context of the claim and specification, the term "visually blend in" or "artistically blends in" is understood by a person of ordinary skill in the art to mean that the color, finish, and surface artwork of the housing would form a harmonious visual effect with the art on the poster. This Honorable Court should not employ the prosecution history to aid interpretation where there is more reliable and less ambiguous evidence of the claim's meaning-the specification itself.

Even if the term "camouflaged" was used in a manner suggested by JAKKS, the prosecution history language represents just one example of how artwork can be used. As with its arguments relating to the specification, JAKKS is attempting to limit the claim language at issue to a single embodiment. Perhaps this explains why JAKKS omits a key phrase when quoting language from the prosecution history, namely the words "for example." The full quote is:

> The housing or blister pack material allows artwork to be placed on the blister pack, by lithograph color technology, **for example**, so that the electronic circuitry

and sound emanating means under the housing is "camouflaged" in the poster presentation.

*See*, Exhibit E.  (**Emphasis added**).  Thus, as with the specification, Clark was simply providing the Examiner with one example or embodiment of the claimed invention.

At the very least, the meaning of the term "camouflaged" in this context is ambiguous. The Federal Circuit has strongly cautioned against relying on ambiguous statements in the prosecution history to limit claim scope. The *Phillips* court admonished that because "the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Phillips*, 415 F.3d at 1317.  *See also*, *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1401 (Fed. Cir. 2008) ("We have considered the cited prosecution history and conclude that it lacks the clarity of the specification regarding the meaning of the claim terms at issue here, thus rendering it less useful for claim construction purposes."); *AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1381 (Fed. Cir. 2005) ("declin[ing] to give the prosecution history much weight" due to ambiguity).  Thus, the prosecution history limits claim language so as to exclude any interpretation that was surrendered during prosecution.

> **6.    Clark's Interpretation of the "Wherein" Limitation Satisfies the Definiteness Requirement of 35 U.S.C. § 112, ¶ 2**

Section 112, paragraph 2 of Title 35 — known as the definiteness requirement — demands that the patent document "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  Clark's aforementioned definition of the "wherein" limitation satisfies this requirement.

The Federal Circuit has stated that "[t]he test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005). *See also*, *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1373 (Fed. Cir. 2008) (relying on *SmithKline* for the same proposition). A patentee does not have to "define his invention with mathematical precision" to comply with the definiteness requirement. *Oakley, Inc. v. Sunglass Hut Intern.*, 316 F.3d 1331, 1341 (Fed. Cir. 2003); indeed, terms of degree such as "substantially," "about," and "closely approximate" are frequently used in claim drafting and "when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts … even if experimentation may be needed." *Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821 (Fed. Cir. 1988). *See also*, *Verve, LLC. v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002) (stating the "when the term 'substantially' serves reasonably to describe the subject matter so that its scope would be understood by persons in the field of invention, and to distinguish the claimed subject matter form the prior art, it is not indefinite"). And "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," the Federal Circuit has "held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). In short, "[o]nly claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

JAKKS is likely to rely on the *Datamize* case to assert that Clark's proposed definition of the "wherein" limitation is indefinite under 35 U.S.C. § 112, ¶ 2. *Datamize* is inapposite. The Federal Circuit in *Datamize* held the claim term "aesthetically pleasing" indefinite because the patentee "offered no objective definition identifying a standard." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005). According to the court, "[a] purely subjective construction of 'aesthetically pleasing' would not notify the public of the patentee's right to exclude since the meaning of the claim language would depend on the unpredictable vagaries of any one person's opinion of the aesthetics of interface screens. While beauty is in the eye of the beholder, a claim term, to be definite, requires an objective anchor." *Id.* at 1350.

In contrast to the claim term in *Datamize*, the definition of the "wherein" clause in the present case is amenable to construction and is not insolubly ambiguous. Indeed, as argued above, based on the intrinsic record, dictionaries, and comparable sources, a person of ordinary skill in the art would understand that the phrase "artistically blend in" to mean that the color, finish, and surface artwork of the housing form a harmonious visual effect with the art on the poster. And a person of ordinary skill in the art would understand that which does not artistically blend in. *See*, Section III.A.3, *supra*.

In addition, the term "artistically blends in" is a word of degree. As the Federal Circuit noted, when words of degree (e.g., "approach each other", "close to", "substantially equal", and "closely approximate") serve "reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts." *Andrew*, 847 F.2d at 821. A key distinction Clark made over the Hoshi prior art reference was that the '272 invention claimed housing artwork that "housing can be printed with artwork so as to visually blend in with the

actual artwork of the poster." *See*, Exhibit E. This distinction is present in the "wherein" limitation, namely the words "artistically blends in with the surrounding poster art that is not covered by the housing." This distinction would be understood by a person of ordinary skill in graphic design.

It should also be noted that indefiniteness is very difficult to prove. Like all issued patents, the '272 patent is presumed valid under 35 U.S.C. § 282, and therefore, "[p]roof of indefiniteness requires such an exacting standard because claim construction often poses a difficult task over which "expert witnesses, trial courts, and even the judges of this court may disagree." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Because of this high burden and the nature of claim drafting, the Federal Circuit has been reluctant to invalided patents as indefinite. A few examples illustrate this point.

In *Bancorp Services, L.L.C. v. Hartford Life Insurance Co.*, 359 F.3d 1367 (Fed. Cir. 2004). Bancorp owned a patent related to a system for administering and tracking the value of life insurance policies in several accounts. All of the independent claims of the patent referred to ''surrender value protected investment credits,'' and it is this phrase that Hartford asserted was indefinite. Hartford argued that the term was not defined in the patent and it does not have a commonly understood meaning by persons having ordinary skill in the art. The court agreed with Hartford that ''surrender value protected investment credits'' was not defined in the patent and Bancorp did not provide an industry publication that defines the term. Nevertheless, said the court, ''the components of the term have well-recognized meanings, which allow the reader to infer the meaning of the entire phrase with reasonable confidence.'' The court, citing the presumption of validity that accompanies issued patents, refused to invalidate claims under 35 U.S.C. § 112, ¶ 2.

And in *Young v. Lumenis, Inc.* 492 F.3d 1336 (Fed. Cir. 2007), Dr. Young invented a surgical method for declawing a domesticated cat. One claim limitation read: ''forming a first circumferential incision in the epidermis *near* the edge of the ungual crest of the claw'' (emphasis added). The district court found the word ''near'' to be indefinite under §112, ¶ 2, and relied on *Amgen Inc. v. Chugai Pharmaceutical Co., Ltd.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991), for the ''principle that a word of degree can be indefinite when it fails to distinguish the invention over the prior art and does not permit one of ordinary skill to know what activity constitutes infringement.'' The Federal Circuit reversed. The court cited *Datamize* for the proposition that claims are indefinite if they ''not amenable to construction or are insolubly ambiguous.… Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning.'' *Datamize,* 417 F.3d at 1347. The court wrote: ''As used in the claim, the term 'near' is not insolubly ambiguous and does not depart from the ordinary and customary meaning of the phrase 'near' as meaning 'close to or at' the edge.'' *Id.* at 1346.

## B.    THE LAW OF INFRINGEMENT

### 1.    Summary Judgment Standard of Review

A court may not grant a motion for summary judgment unless the movant shows an absence of a genuine issue of material fact that remains for trial. *See*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986).   Thus, a court may grant summary judgment ''only if the pleadings, depositions, answers to interrogatories, affidavits and other evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'' *Dominant Semiconductors SDN. BHD. v. Osram GMBH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008); Fed. R. Civ. P. 56(c). With respect to patent infringement, summary judgment ''is proper when no reasonable jury could find that every

limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *U.S. Phillips Corp. v. Iwasaki Electric Co. Ltd.*, 505 F3d 1371, 1374-75 (Fed. Cir. 2007), *quoting*, *PC Connector Solutions LLC v. SmartDisk Corp*., 406 F.3d 1359, 1364 (Fed. Cir. 2005).

The issue of infringement, particularly "[i]nfringement under the doctrine of equivalents requires an intensely factual inquiry." *Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.*, 212 F.3d 1377, 1381 (Fed. Cir. 2000). *See also Finisar Corp. v. DirectTV Group, Inc*., 523 F.3d 1323, 1332 (Fed. Cir. 2008) (noting "[l]iteral infringement is a question of fact"). The *Vehicular* court continued:

> this court is well aware of the difficulty of granting summary judgment motions on issues requiring delicate balancing of many factual components". Ultimately this court may sustain summary judgment of non-infringement under the doctrine of equivalents, where that doctrine is legally applicable, only if it discerns no genuine issues of material fact and that no reasonable jury could find equivalence. *See Warner-Jenkinson*, 520 U.S. 17, at 39 n.8 (1997). **This standard sets a high hurdle which this court does not lightly attempt to surmount**.

*Vehicular*, 212 F.3d at 1381 (**Emphasis added**). *See also*, *Leggett & Platt, Inc. v. Hickory Springs Mfg., Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002).

### 2.    JAKKS Literally Infringes Claims 1 and 5 of the '272 patent

#### a.    JAKKS Violates a "Cardinal Principle" of Patent Infringement Doctrine

Literal infringement requires that the accused device possess every limitation of the claim in question. *See*, *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369 (Fed. Cir. 2009). Thus, a "cardinal principle" of patent infringement jurisprudence is that the "accused device must be compared to the claims rather than to a preferred or commercial embodiment." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003) (referring to this doctrine as a "cardinal principle" of patent law). *See also*, *ACS Hosp. Sys., Inc. v.

*Montefiore Hosp.,* 732 F.2d 1572, 1578 (Fed. Cir. 1984) (stating "[i]nfringement is determined on the basis of the claims, not on the basis of a comparison with the patentee's commercial embodiment of the claimed invention"); *Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) ("[I]t is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent.").

Yet, remarkably, JAKKS attempts to prove its non-infringement assertion by comparing the accused products to "a poster made in accordance with the invention disclosed in the '272 patent." In its Motion, JAKKS compares photos of two of the accused products with *a commercial embodiment* of the '272 patent, and states:

> Perhaps the simplest way to illustrate the difference between what the claims require on the one hand, and what the Accused Posters actually do on the other, is to compare a poster made in accordance with the invention disclosed in the '272 patent with the Accused Posters.

(Doc. 11, at 4). This argument violates a "cardinal principle" of patent infringement doctrine and is a misapplication of the patent law. *See*, Doc. 11, at 4-5.

### b. JAKKS Accused Products Possess Each and Every Limitation of Claims 1and 5 of the '272 patent.

When the proper comparison is made between the claim language of the '272 patent and the accused products, it becomes abundantly clear that JAKKS' posters have each and every limitation of the claims 1 and 5. As noted above, the only limitation JAKKS asserts the accused products do not possess is the "wherein" limitation of claims 1 and 5, which reads:

> Wherein a surface of said housing is prepared with a matching art which is substantially the same as that area which appears on said portion of said poster that said housing covers when said housing is attached to said poster, such that said housing artistically blends in with the surrounding poster art that is not covered by said housing.

Exhibit A, Appendix A, *'272 Patent 3:6-12*. This limitation requires the housing artwork to "artistically blend in with the surrounding poster art that is not covered by the housing." As noted in section III.A.3 above, a person of ordinary skill in the art would understand this limitation to mean that the color, finish, and surface artwork of the housing would form a harmonious visual effect with the art on the poster.

As demonstrated by photographs of the accused products below, the artwork over the housing in each of the accused posters clearly meets this limitation as well as the other limitations of claims 1 and 5. *See*, Exhibit A, Shapiro Declaration, ¶¶ 15-21 and Appendices F-H attached thereto. The accused products are perfect examples of infringing posters.[8]

### i. The "If We Were a Movie" Poster

Illustration 3 below compares the limitations of claims 1 and 5 of the '272 patent with the "If We Were a Movie" accused poster. *See also*, Exhibit A, Shapiro Declaration, ¶¶ 15-19 and Appendix F attached thereto. The poster artwork of "If We Were a Movie" has a primarily magenta background with dark purple and magenta design elements, including swirls and iconic guitars. The speaker housing is glossy magenta plastic, the color of which using the industry-standard PANTONE® Goe Guide coated fan guide[9] exactly matches one of the predominant colors in the poster art, which could be specified as PANTONE 32-2-4-C.[10]

---

[8] There exist at least nine (9) accused products: Hannah Montana "If We Were A Movie" poster; Hannah Montana "Pumpin Up The Party" poster; Hannah Montana "Who Said" Poster; Hannah Montana "Make Some Noise" Poster; Hannah Montana "Life's What You Make It" poster; Hannah Montana "Bigger Than Us" poster; Cheetah Girls "Do Your Own Thing" poster; Cheetah Girls "The Party's Just Begun" poster; and Cheetah Girls "Amigas Cheetahs" poster. *See*, Exhibit C, JAKKS' response to Clark Interrogatory No. 2. The discussion in III.B.2.b.i-iii of three of the aforementioned accused products is illustrative of how all these products infringe on Clark's '272 patent. Although the color scheme blends differently for each accused product, the analysis of all nine accused products is basically the same. Each of the nine accused products possess each and every limitation of claims 1 and 5 of the '272 patent, or at the very least, an equivalent thereof. *See*, Exhibit G (pictures of remaining six (6) products.

[9] The PANTONE GoeGuide is used by persons of ordinary skill in the art to select, specify and communicate the 2,058 solid colors within the PANTONE Goe System. *See*, Shapiro Declaration, ¶ 9. Pantone, Inc., a subsidiary of X-Rite, Inc., has been a worldwide provider of color systems and technology for the selection and communication of color in a number of industries for more than 45 years. Until 2007, when Pantone launched the Goe System, which nearly doubled the number of colors, the PANTONE Matching System (PMS)—which has an identifying number

In this case, color is not the only attribute that unites the speaker housing design with the poster art. The texture of the paper the poster is printed on is glossy; it has been coated with film or liquid gloss lamination. The speaker housing is glossy plastic. The design elements in the poster art include guitars and flowery swirls, and the speaker housing has been embossed with swirl-like elements that echo those of the background art.

*Illustration 3: "If We Were a Movie" Poster*



a poster comprised of a first material, said poster having a first surface, said first surface including poster art thereon;

a housing comprised of a second material, said housing attached to a portion of said first surface of said poster;

a speaker concealed between said housing and said first surface of said poster;

an electric circuit including a sound production component, operatively connected to said speaker and concealed between said housing and said first surface of said poster;

a trigger attached to said electric circuit and concealed within said housing, said trigger adapted to be actuated through said housing to produce said sound;

wherein a surface of said housing is prepared with a matching art which is substantially the same as that area of said poster art which appears on said portion of said poster that said housing covers when said housing is attached to said poster, such that said housing artistically blends in with the surrounding poster art that is not covered by said housing.

Magenta color of speaker housing artistically blends with poster art because it exactly matches predominant color of poster background.

PANTONE® 32-2-4 C

---

for each of its 1,114 colors— was industry-standard methodology for specifying colors of printing ink. As Ken Garland wrote in *Graphics, Design & Printing Terms: an International Dictionary* (Design Press Division of Tab Books, NY; 1980, 1989): "…in specifying color of printing ink, customer only needs to supply printer with reference number." Pantone has since expanded its color matching system to other industries, including digital technology, fashion, home, plastics, architecture and contract interiors, and paint.

[10] It is likely that the designer of the Hannah Montana posters used one of the 1,005 chips in the PANTONE PLASTICS Opaque Selector to choose a color for the opaque plastic used in the speaker housing and match it to a predominant color in the background art, which was probably created in Adobe Photoshop in RGB (colors native to digital photography and used in Web applications) and changed to the CMYK (four process) colors used in offset printing. The Goe chips shown in Appendices E-G in the Shapiro Declaration illustrate how well the colors of the plastic blend with the backgrounds of the poster art.

### ii.     The "Make Some Noise" Poster

Illustration 4 compares the limitations of claims 1 and 5 of the '272 patent with the "Make Some Noise" poster.  *See also*, Exhibit A, Shapiro Declaration, ¶¶ 15-18, 20, and Appendix G attached thereto. The background of the "Make Some Noise" poster is prominently lavender and aqua. The lettering of the word "Hannah" is black outline and appears to have gold, sequin-like design elements. The world "Montana" is black outline and filled with light lavender. The texture of the paper the poster is printed on is glossy, and it's been coated with film or liquid gloss lamination. The "Make Some Noise" speaker housing is glossy lavender plastic, which, using the industry-standard PANTONE® Matching System (GoeGuide Coated fan guide) exactly matches the upper background in the upper right and right-hand area of the poster art and the interior of the "Montana" lettering, which could be specified as PANTONE 51-3-2 C. Significantly, the plastic speaker housing has been embedded with actual gold glitter that echoes the glittery gold poster of the pop star's clothing, the sequin-like elements in the "Hannah" lettering and the stars in the background art. Clearly, designers sought to artistically blend it in with the star's wardrobe, the "Hannah" letterforms, and the stars and stage light elements in the poster background art.

***Illustration 4: "Make Some Noise" Poster***

a poster comprised of a first material, said poster having a first surface, said first surface including poster art thereon;

a housing comprised of a second material, said housing attached to a portion of said first surface of said poster;

a speaker concealed between said housing and said first surface of said poster;

an electric circuit including a sound production component, operatively connected to said speaker and concealed between said housing and said first surface of said poster;

a trigger attached to said electric circuit and concealed within said housing, said trigger adapted to be actuated through said housing to produce said sound;

wherein a surface of said housing is prepared with a matching art which is substantially the same as that area of said poster art which appears on said portion of said poster that said housing covers when said housing is attached to said poster, such that said housing artistically blends in with the surrounding poster art that is not covered by said housing.



Light lavender color of speaker housing artistically blends in with poster art because it exactly matches background area on right side of poster and interior of "Montana" lettering.

PANTONE®
51-3-2 C

### iii.    The "Bigger Than Us | Part Time Pop Star" Poster

Illustration 5 compares the limitations of claims 1 and 5 of the '272 patent with the "Bigger Than Us" poster. *See also*, Exhibit A, Shapiro Declaration, ¶¶ 15-18, 21, and Appendix H attached thereto. The "Bigger Than Us" poster art has a predominantly magenta and purple background with turquoise, and to a lesser extent, light green, accents. There is turquoise in the gradient in the large, all-caps "Part Time Pop Star" lettering, in the blouse the pop star on the left is wearing, and in the background of the decorative, sticker-like area that contains the "Hannah Montana" letterforms. The texture of the paper the poster is printed on is glossy, and it's been coated with film or liquid gloss lamination. The Part Time Pop Star" speaker housing is glossy turquoise plastic, the color of which, using the industry-standard PANTONE® Matching System (GoeGuide Coated fan guide) exactly matches the turquoise in the poster art, which could be

specified as PANTONE 99-1-2 C. Although the housing color is lighter in value than the turquoise in the background of the sticker-like area, it artistically blends in. Metallic glitter was added to the lavender plastic, which picks up the stars in the poster art.

***Illustration 5: "Bigger Than Us | Part Time Pop Star" Poster***

a poster comprised of a first material, said poster having a first surface, said first surface including poster art thereon;

a housing comprised of a second material, said housing attached to a portion of said first surface of said poster;

a speaker concealed between said housing and said first surface of said poster;

an electric circuit including a sound production component, operatively connected to said speaker and concealed between said housing and said first surface of said poster;

a trigger attached to said electric circuit and concealed within said housing, said trigger adapted to be actuated through said housing to produce said sound;

wherein a surface of said housing is prepared with a matching art which is substantially the same as that area of said poster art which appears on said portion of said poster that said housing covers when said housing is attached to said poster, such that said housing artistically blends in with the surrounding poster art that is not covered by said housing.



Light turquoise color of speaker housing artistically blends in with colors of elements in type and images on poster.

PANTONE®
99-1-2 C

Based on Illustrations 3-5 and the Shapiro Declaration (Exhibit A), a reasonable jury could find that the accused posters literally infringe claims 1 and 5 of the '272. At the very least, there are genuine issues of material fact relating to the issue of infringement. Why did JAKKS select the color scheme it did for the housing units of the accused posters? Surely there was artistic judgment behind this selection. One can plausibly infer — indeed, it is likely — that the aesthetic decision was based on the belief that the color schemes were chosen to artistically or visually blend it with the surrounding poster artwork. A jury should be given the opportunity to answer this question.

### 3. JAKKS' Accused Products Infringes Claims 1 and 5 of the '272 Patent Under the Doctrine of Equivalents

Even if the court finds that literal infringement is lacking, JAKKS will infringe under the doctrine of equivalents if the accused products "perform[] substantially the same function, in substantially the same way, to achieve substantially the same result, as disclosed in the claim." *Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1296 (Fed. Cir. 2009). Alternatively, "[e]quivalency may also be proven where the differences between the invention as claimed and the accused product or process are insubstantial." *Vehicular*, 212 F.3d at 1381. As noted above, this inquiry is "intensely factual," and summary judgment is proper "only if [the court] discerns no genuine issues of material fact and that no reasonable jury could find equivalence." *Id.* Accordingly, [t]his standard sets a high hurdle which this court does not lightly attempt to surmount." *Id.*

The "insubstantial differences test is designed to determine whether the alternative [i.e., accused product] is sufficiently close to the claimed feature that the patentee should be able to capture the equivalent and bar its use by a competitor." *Festo X*, 493 F.3d at 1380. The accused products in the present case are "sufficiently close to the claimed feature" in claims 1 and 5 of the '272 patent. At the very least, genuine issues of material fact exists relating to whether there are insubstantial differences between the artwork on the housing of JAKKS accused products and what is claimed in the '272 patent, namely artwork whereby the color, finish, and surface artwork of the housing would form a harmonious visual effect with the art on the poster. *See*, Exhibit A, Shapiro Declaration, ¶¶ 15-21 and Appendices F-H. In the light of the aforementioned comparison of the accused products with the claim language of the '272 patent, a jury should be given an opportunity to decide this "intensely factual" inquiry.

To the extent prosecution history estoppel — a doctrine that has a potentially limiting effect on equivalents — applies to the present case, the question of whether the equivalent feature of the accused product would have been unforeseeable becomes relevant. When a patentee narrows his claims during prosecution for a reason related to patentability, it is presumed that the patentee "surrendered all territory between the original claim limitation and the amended claim limitation." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003) ("*Festo IX*"). But contrary to JAKKS assertion that Clark would be completely barred from proving equivalents, this presumption may be rebutted. As the Supreme Court stated:

> This presumption is not, then, just the complete bar by another name. Rather, it reflects the fact that the interpretation of the patent must begin with its literal claims, and the prosecution history is relevant to construing those claims. When the patentee has chosen to narrow a claim, courts may presume the amended text was composed with awareness of this rule and that the territory surrendered is not an equivalent of the territory claimed. **In those instances, however, the patentee still might rebut the presumption that estoppel bars a claim of equivalence**. The patentee must show that at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 741, 122 S.Ct. 1831, 1842, 152 L.Ed.2d 944 (2002) ("*Festo VIII*") (**Emphasis added**). In its response to Clark's Interrogatory No. 2, JAKKS misleadingly cropped the above quote from the *Festo* case, and completely failed to mention the fact that the presumption is rebuttable. *See*, Exhibit C JAKKS' response to Clark Interrogatory No. 2.

The most common way to rebut this presumption is for the patentee to "demonstrate that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment." *Festo IX*, 344 F.3d at 1368. This inquiry has several underlying factual considerations. As the Federal Circuit as noted:

> By its very nature, objective unforeseeability depends on underlying factual issues relating to, for example, the state of the art and the understanding of a hypothetical person of ordinary skill in the art at the time of the amendment. Therefore, in determining whether an alleged equivalent would have been unforeseeable, a district court may hear expert testimony and consider other extrinsic evidence relating to the relevant factual inquiries.

*Id.* at 1369. Thus, even assuming the doctrine of prosecution history estoppel may apply, its application is factually intense and may require expert testimony and other extrinsic evidence to determine whether the housing artwork scheme used by JAKKS was unforeseeable at the time Clark amended his patent application. Recall that Clark was the first to invent a talking poster that included that artwork on the housing that artistically blended with the remaining poster art. In the light of the fact that the talking poster field was new, it is entirely plausible that Clark did not foresee every artistic scheme that was developed *after* Clark filed his amendment. If the court finds that prosecution history estoppel creates the aforementioned rebuttable presumption, Clark should be given the opportunity to rebut this presumption by offering "expert testimony and … other extrinsic evidence relating to the relevant factual inquiries." *Festo IX*, 344 F.3d at 1369.

## IV.  CONCLUSION

**WHEREFORE**, based on the foregoing, there are several genuine issues of material fact that remain to be tried on infringement. As such, Clark respectfully requests that the Court deny JAKKS' Motion for Summary Judgment.

Respectfully submitted,

**THE DICKERSON LAW GROUP, P.A.**
/s/ Brian E. Dickerson_____
Brian E. Dickerson (0069227)
Sharlene I. Chance (0070999)
Kevin R. Conners (0042012)
5003 Horizons Drive, Suite 101
Columbus, OH 43220
Telephone: (614) 339-5370
Facsimile:  (614) 442-5942
bdickerson@dickerson-law.com
schance@dickerson-law.com
kconners@dickerson-law.com
*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 3, 2009, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system upon counsels of record.

/s/ Sharlene I. Chance_____
Sharlene I. Chance (0070999)
*Attorney for Plaintiffs*