EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| AARON CLARK, et al., | : | |
|---|---|---|
| *Plaintiffs,* | : | |
| v. | : | Case No. 2:08CV982 |
| | : | |
| THE WALT DISNEY COMPANY, et al., | : | Judge Holschuh |
| | : | |
| *Defendants.* | : | Magistrate Judge Abel |

### DECLARATION OF JOHN PEIRANO

STATE OF FLORIDA )
                 )SS
COUNTY OF SARASOTA )

John Peirano, being first duly cautioned and sworn, states the following:

1. I am a co-patent owner of U.S. Patent No. 5,548,272 ("the '272 patent"). I personally invested nearly $100,000 in actual cost for 50% ownership in the '272 patent. I purchased ownership in the '272 patent in 1998 based upon believing the patent rights being purchased protected this novel product from all other products that would compete in the marketplace as an electronic poster. I further believed that the patent protected against adding any sound byte to a poster image print by encasing components within a said housing unit, and then attaching that said housing unit to the poster image.

2. Upon first learning of the Hannah Montana Posters patent infringement by email and by phone discussions held with Mr. Aaron Clark in March 2008, I trusted Mr. Clark's judgment as the original inventor and businessman that had sold product to all mass retailers to include WalMart, Kmart, and Target. From our phone and email correspondence I believed that there was very good reason that the two of us as co-owners of the "3" Talking Poster Patents should not only to be alarmed, but that we would most likely be forced to take judicial action in

protecting our patents intellectual property rights. In other words, I first trusted and relied upon Mr. Clark's knowledge as the inventor of the Talking – Musical – Electronic sound byte Poster, along with his additional years of experience and success that he possessed in selling hundreds of thousands of units within the consumer marketplace.

3. Since discovering the Hannah Montana Musical Posters through contact with my Mr. Clark, I decided to do additional personal research in comparing the Hannah Montana Posters to our tri-patented sound electronic posters. The very first thing I did between April 2008 and June 2008 was to drive to Walmart, Kmart, and Sarasota Square mall to try and purchase one of the products so that I could hold it in my hands and compare it to our patented product. I was unable to obtain a physical product after spending time driving around town. As a result I began doing research online so that I could visually inspect the Hannah Montana Posters and thus visually compare them to what I was discussing with Mr. Clark. I also wanted to determine once viewed online if I would recognize them to be similar to the electronic poster that Yaboom introduced to the marketplace in the year 2000. I browsed JAKKS Pacific Company website (to learn where JAKKS channeled product), eBay, Amazon.com and several other company websites that JAKKS distributed product to. As a result, I was able to see the Hannah Montana product online and compare it to the two physical samples (Christina Aguilera and Brittany Spears) I had in my hands.

4. In addition to researching company websites prior to June 2008 and prior to any lawsuit being filed, I further explored the USPTO.GOV website upon learning from Mr. Clark that our '272 patent maintenance fees were due in July 2008. As a result I not only researched our '272 patent online but also called the USPTO.GOV Patent and Trademark website to get information regarding all three of our co-owned audio Poster patents. After speaking with a

representative attorney at the United States Patent Office I further researched patent records at the USPTO.GOV website to determine if JAKKS Pacific had somehow received a patent which was now allowing them to market a competing product that was to my perception an exact or identical product to our patented product. I did so in an effort to determine if JAKKS had received a patent to produce such an exact product, and if so, then how was it considered distinctly different then our '272 patent. In researching the United States Patent Office online records in June-July 2008, I did not discover a patent allowing JAKKS Pacific, or any company for that matter, the right to produce a poster of likeness to the Hannah Montana posters which were being sold within the marketplace. In not discovering a patent granting the right for JAKKS to distribute and sell an electronic audio poster which was perceived to be an identical product by the inventor Mr. Clark, the co-patent owner being myself, potential licensees, and also consumers, I then agreed with Mr. Clark and Mr. Clark's chosen counsel, that action needed taken to protect a product in which I had invested a great deal of personal resources. Even more so then my time and resources invested, action needed taken to protect a product I believed still had tremendous marketability, and in an effort not to have to compete in the future with a company that had substantially greater connections and resources in convincing buyers of national retail chains to purchase their product versus out patented product.

5.  From my online patent research, I believed that JAKKS Pacific had filed for a patent and was declined, or failed to properly research the United States patent database, and thus based on their success-size, established vendor relationships, along with their substantial resources, that they mistakenly and/or purposefully placed product worldwide of the Hannah Montana electronic posters.

3

6.      I have always believed that there was and continues to be patent infringement based on my comparison of the '272 patent with Defendant JAKKS' Hannah Montana accused posters still being sold around the world.  In addition to my reasons above, I feel it should be noted that I was not just a silent partner when Aaron Clark and I were manufacturing our co-patented posters together.  I gained much experience in flying to China to establish manufacturing facilities for the Talking Poster.  In effort to reduce manufacturing cost of our patented product, as a businessman I dissected the sound device module and discussed with manufacturing facilities how we could offer the best quality product to consumers for the least cost.  In doing so, I learned about and sourced EACH individual component within our sound modules.  I became intricately involved as a co-owner of the patent in understanding function and cost of every piece from IC CHIP message retention, PCB board soldering, Battery lifespan differences, speaker size and quality, PVC casing and printing, etc.  While actively manufacturing product I established many business relationships for sourcing our product.  One specific source worth noting during my involvement in bringing product to market is DUCO Technologies which is based out of Henderson, Nevada, and the company that was used to source our sound modules based on their solid factory relationships and partial ownership of a China factory.  DUCO Technologies produced several hundred thousand sound modules between 1998-2001 for Aaron Clark Industries and Audio Images Talking Posters which were Aaron Clark and my respective companies.  During this timeframe DUCO believed we were the only company able to produce posters having an audio module added for sound.  DUCO Technologies further involved in the Advertising Specialty industry engaged discussions with Mr. Clark and I regarding producing and licensing our patented poster technology.  Discussions to manufacture ad specialty product were conducted regarding PEPSI CO / Dr. Pepper, Ford

4

Motor Company, and also Chase Banks.  Prior to DUCO Technologies relationship I established, Mr. Clark had established relationships with Jim Stern of Bliss Electronics, and Tim Clegg of Clegg Electronics, each of which had produced hundreds of thousands of sound modules for Mr. Clark prior to my co-ownership of the patent.  Each of which I personally established business contact and relationships with after learning about their prior involvement in our sound module manufacturing process.   Each of which believed during my discussions with them that our product was the only patented and protected audio poster product within the marketplace.   Each of which were very interested based on our patents granted in being the sole supplier of our sound modules.

       7.     In not being a patent attorney but a businessman, to me an electronic, musical, or talking poster, no matter what you call it, is what it is, and the fact that an infringement case involving my shared '272 patent has thus far been defeated or dismissed on the basis or claim that the Hannah Montana Posters do not infringe because the housing unit disrupts the art of the poster print, or does not perfectly blend to the artwork of the poster image, is ludicrous to me. Out of the nine (9) Hannah Montana Posters I have personally and physically inspected, EACH and EVERY one of these units have housing units that match the poster's image color art somewhere within the art print of the poster.   In further exploring EACH and EVERY Hannah Montana musical – talking – electronic poster that was sold at the retail level, several of the posters sound housing units IDENTICALLY match the color directly above the housing unit in attempt to blend the housing unit to the  poster print image color found DIRECTLY ABOVE or ATTACHED to the housing unit.  To me, as a professional holding a marketing degree, it is obvious that this was done by JAKKS Pacific to offer an improved poster print which

Case 2:08-cv-00982-JDH-MRA   Document 71-6   Filed 12/09/09   Page 6 of 8

aesthetically matches the housing unit to a portion of the poster image in an effort to simply sell more units.

8. As a result, I believed there was infringement when this lawsuit was filed in 2008, and I believe to this day, that the mere fact of improving upon or coloring the Hannah Montana sound module housing unit to match a color exhibited within the poster art, demonstrates to me that this was done purposefully as a business decision. I further believe that trying to aesthetically match the Hannah Montana housing units based upon their attached position to the bottom of the poster print, and based on prior feedback received to improve upon past sales experienced by Yaboom in 2000, that the matching color was only added to visually offer a more attractive product to the consumer. To the best of my knowledge, I recall YABOOM/TOYMAX International as either being a subsidiary or acquired by JAKKS Pacific, Inc.

9. In further dissecting the color of the housing unit based upon one of the claims of the '272 patent, and in comparing the several hundred thousand '272 patented posters produced and sold within the consumer marketplace, more specifically the licensed Warner Brothers Batman Forever, Sony Godzilla, Warner Brothers Space Jam Michael Jordan, and Saban Entertainment's Power Rangers Talking Posters, All OF THESE '272 patented units DEMONSTRATED ONE COLOR housing units affixed to a poster print. The current judgment ruling in favor of JAKKS Pacific is effectively and essentially stating that our VERY OWN manufactured one color module patented '272 posters, are a completely different product, then our patented '272 Posters produced having blended art housing units that aesthetically match a posters artwork. This is simply not the case, and if you were to display two of our very own posters by placing them side by side, one having a one color housing module and one having a blended color housing module, and then you were to ask the inventor, myself as co-

6

patent owner, past and potential future licensees, consumers, or even other patent holders if they perceive these two posters being displayed side by side as being a different invention, they would ALL look at you confused in wondering what you were even asking them.   In other words, this judgment is unnerving to me in that it essentially states that our VERY OWN past ONE color module housing unit which do not aesthetically blend to the poster image print art the Way our New Line Cinema Austin Powers-Dr. Evil, and our Winterland Nsync-Backstreet Boys-Ricky Martin modules produced with blended housing units are a completely different product.   I do not personally see our product as being a different product or invention when placed side by side in examination of the housing modules being of one color or of blended color.   Thus, I do not see how JAKKS Pacific housing unit has allowed and is allowing them to produce an audio poster which is identical in function and even design just barring a different placement of the housing unit could in any way be seen as not infringing.  Furthermore, the units sold in marketplace under Aaron Clark Industries LLC, Inotrend Inc., Resaurus, and Audio Images Talking Posters all relied upon the novel idea that they were all protected by the '272 patent in essentially being a TALKING – MUSCIAL – ELECTRONIC SOUND BYTE POSTER.  Each one of these companies and the respective officers fully believed they were producing a protected audio poster product no matter what the color or colors of the housing unit, or there would have never been units produced with one solid color.   To say it otherwise, whether or not sales of the '272 patented product occurred with a solid one color housing unit or a blended housing unit did not matter to ALL COMPANIES that produced our '272 patented posters, but the fact that ALL companies brought products to market believing they were doing so under protection of a patent that protected the invention from being knocked off by something as simple as blending art should.

10. In summary, based on my independent investigation and informed comparison of the claims of our patent with the accused posters, consultation with my prior business partner and co-owner of the patent, Mr. Clark, and per relayed advice of counsel, Mr. Dickerson, I more than reasonably believed that Defendant JAKKS' infringed on the '272 patent.

11. I declare under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

FURTHER DECLARANT SAYETH NOT.

_____12-9-09_____            _____John Peirano_____
DATE                            JOHN PEIRANO